COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Athey, Ortiz and Chaney

KEVIN LEE BETHEA

v.      Record No. 1019-23-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE CLIFFORD L. ATHEY, JR.
AUGUST 13, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Gary A. Mills, Judge

(Joshua A. Goff; Goff Voltin, PLLC, on brief), for appellant.
Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Lucille M. Wall, Assistant
Attorney General, on brief), for appellee. Appellee submitting on
brief.

In the Circuit Court of the City of Newport News ("circuit court"), on January 23, 2023, pursuant to a written plea agreement, Kevin Lee Bethea ("Bethea") pled guilty and was convicted of robbery causing serious bodily injury, malicious wounding, two counts of abduction, two counts of use of firearm in the commission of a felony, grand larceny, and possession of a firearm within ten years of having been adjudicated delinquent of a felony offense. The circuit court sentenced Bethea to a total of 90 years of incarceration with 63 years suspended, leaving Bethea an active sentence of 27 years to serve with 10 of those years being mandatory. On appeal, Bethea assigns error to the circuit court: 1) for finding his guilty pleas were voluntarily entered; 2) for conducting a deficient plea colloquy; and 3) for imposing a 27-year active sentence without properly weighing his mitigating evidence. Finding no error, we affirm the circuit court's judgment.

_____

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

# I. Background[1]

In July of 2021, Bethea "broke up with" his girlfriend, Alyssa Williams ("Williams"). Williams resided with her 84-year-old grandfather, William Troy Wright ("Wright") in his home near a golf course in northern Newport News. During the night of July 7, 2021, Bethea, along with his friend, approached Williams as she stood on the front porch of her grandfather's home. Bethea brandished a firearm before subsequently "dragg[ing] her around" the golf course by her arm until Bethea's friend persuaded him to flee. After they fled, Williams called 911 and reported the incident. She subsequently obtained a protective order against Bethea and entered "into police custody for her safety."

On July 9, 2021, Bethea returned to Wright's home searching for Williams. Although Wright explained to Bethea that Williams was not at the house, Bethea responded by pointing a firearm at Wright and threatening to kill him. Wright then permitted Bethea to enter his home to verify that Williams was not present. Bethea then demanded to know Williams's whereabouts. Wright responded that, "she is not here[-] She's with the police[-] I don't know where she is[,]" whereupon Bethea attacked Wright, knocking him unconscious by repeatedly striking the "back of [his] head" and body. Bethea next took Wright's cell phone and sent messages to Williams, posing as Wright. Williams recognized that these messages deviated from Wright's usual phrasing and contacted the police to request a "welfare check" for Wright.

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the circuit court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Parts of the record in this case are sealed, but Bethea's appeal necessitates unsealing relevant portions of the record to resolve the issues he raises. So, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

Police arrived at Wright's home in response to Williams's request, finding Wright on the floor, covered in blood, disoriented, and still bleeding from cuts on his head and arms. Wright informed law enforcement that his car, wallet, keys, and cell phone were missing before paramedics transported Wright to the hospital for treatment. As a result, Bethea was pursued and arrested. A grand jury subsequently indicted Bethea for robbery causing serious bodily injury, malicious wounding, two counts of abduction, five counts of use of firearm in the commission of a felony, carjacking, possession of a firearm within ten years of having been adjudicated delinquent of a felony offense, grand larceny, and two counts of assault and battery.

Before trial, at Bethea's request, the circuit court ordered a forensic examiner to evaluate Bethea's competency to stand trial and his sanity at the time of the offenses. The examiner interviewed Bethea and reviewed medical records obtained from the jail where he was held. During the interview, Bethea reported to the examiner that he had not been eating or sleeping well prior to their discussion as he had recently learned "that his brother had been shot and killed."

Bethea also disclosed to the examiner that he had received "special education services" in school "due to a learning disability" and subsequently dropped out of school in the ninth grade. Bethea also disclosed that he had previously received psychiatric treatment for anxiety and was "later diagnosed with schizophrenia and bipolar disorder," although he had "never been psychiatrically hospitalized." Bethea also advised that while incarcerated a doctor diagnosed him with "major depression disorder with psychosis and anxiety" and he was now receiving medications for those conditions.

The forensic examiner opined that Bethea was competent to stand trial because he "possesse[d] a capacity for rational and factual understanding of court and the ability to assist

counsel in his own defense."[2] She also noted that during the interview, Bethea's "speech was clear and coherent" and that he displayed a logical thought process "without any signs of psychotic disorganization" or "mental illness." She further observed that although Bethea reported that he "heard 'voices' talking to him 'about the case,'" Bethea's "description of the voices" was "more consistent with negative internal dialogue" than "genuine auditory hallucinations." In addition, she opined that Bethea exhibited a "relatively strong knowledge of court-related information," based on him correctly identifying his charges, describing the roles of the circuit court and counsel, and "rationally discuss[ing]" his plea options, trial rights, and legal strategy. As a result, the examiner concluded that Bethea possessed sufficient fitness to stand trial for his charged offenses.

Several weeks later, Bethea's initial defense counsel withdrew, and a second attorney was appointed to represent Bethea. After conferring with Bethea, his new counsel moved for a second evaluation of Bethea's competency to stand trial as well as his sanity at the time of the offenses. During the hearing on this motion, Bethea's counsel justified a second mental evaluation based on Bethea not having been "fully invested in cooperating with the examiner the first time" because of his brother's recent death. Counsel for Bethea also provided the circuit court with a copy of an earlier forensic examination report previously ordered by the general district court, suggesting that Bethea had significant underlying psychiatric conditions that "call[] into question [his] mental status at the time of the offense." During argument on the motion, Bethea's counsel further clarified that he only sought examination to re-evaluate Bethea's sanity at the time of the offenses; he "[was] not concerned about [Bethea's] competency to stand trial."

---

[2] The examiner also gave Bethea's defense counsel a separate report containing the examiner's opinion regarding Bethea's sanity at the time of the offenses. This sanity evaluation is not part of the appellate record.

The circuit court denied the motion for a second evaluation of Bethea's sanity at the time of the offenses and set a trial date.

Approximately one month before trial, Bethea informed the circuit court that he had retained a private forensic examiner to re-evaluate his sanity at the time of the offense and moved for a continuance of the trial date to accommodate his examiner's schedule. The circuit court also denied this motion on November 28, 2022, by written order, reasoning that Bethea was neither constitutionally nor statutorily entitled to seek "new, different medical opinions" and that due to a "backlog of jury trials pending due to the COVID-19 pandemic" justice would not be served by the continuance Bethea sought.

On December 6, 2022, the morning of Bethea's scheduled jury trial, his counsel proffered that Bethea wished to "address the Court directly about some concerns that he has." Bethea then again requested a continuance to allow him to obtain a second evaluation of his sanity at the time of the offenses and to subpoena witnesses who could corroborate his insanity defense. At that time, Bethea proffered that "three days ago," he had provided the names of two witnesses who would confirm that he was not "in [his] right state of mind" during the offenses. Bethea continued to maintain that his first sanity evaluation was deficient because he had been distracted during the forensic interview due to his brother's death.

In support of the third motion for a continuance, Bethea's counsel proffered that he recently had received a plea offer from the Commonwealth that he had "attempt[ed]" to discuss with Bethea, but he had been unable to do so as Bethea told him that "he was nervous and just d[id]n't understand what's going on." Bethea's counsel further clarified that he needed the additional time to review the plea offer with Bethea and discuss his trial rights because "I just haven't gotten really firm answers to any of those questions, which makes it really difficult." The Commonwealth objected to this request, arguing that Bethea was trying to use a delay tactic

- 5 -

that would unfairly prejudice the prosecution. The Commonwealth proffered that one of the victims was elderly and in deteriorating health and as a result would likely be unable to attend a later trial date. The Commonwealth also proffered that while incarcerated, Bethea had attempted to call his now-deceased brother so that he could "coach" Bethea regarding his "mental health and how it would affect his case."

The circuit court then denied Bethea's third continuance request. The circuit court noted that Bethea had already undergone evaluations of his sanity and competency and been found competent to stand trial. And the court concluded that Bethea was "trying to manipulate the system" by delaying the trial. The court then took a recess to allow the parties to discuss a proposed plea agreement.

Upon returning from the recess, the Commonwealth and counsel for Bethea indicated that Bethea had agreed to plead guilty to some of his charges pursuant to the terms of a written plea agreement. The written plea agreement proposed that in exchange for Bethea pleading guilty to: 1) robbery causing serious bodily injury; 2) malicious wounding; 3) two separate counts of abduction; 4) two separate counts of use of a firearm in the commission of a felony; 5) a grand larceny[3] charge; and 6) possession of a firearm within ten years of having been adjudicated delinquent of a felony offense, the Commonwealth would move to nolle prosequi all remaining indictments. But Bethea reached no agreement with the Commonwealth with respect to his sentencing, which the plea agreement left to the discretion of the circuit court following a sentencing hearing.

Bethea then serially pled guilty to each of the specific crimes, consistent with his plea agreement. Before accepting Bethea's guilty pleas, however, the circuit court conducted a colloquy with Bethea to determine whether Bethea had entered his guilty pleas voluntarily and

---

[3] This charge was originally for carjacking but was amended to grand larceny.

intelligently. During the colloquy, Bethea confirmed that he could "read, write[,] and understand the English Language" and had completed the "ninth" grade. Bethea also verified that he had not "consumed any alcohol or . . . illegal substances" within the "last 12 hours" and did not have "any mental conditions . . . that would cause [him] to be unable to assist" his defense counsel "or understand the proceedings." Bethea also acknowledged that he had reviewed the terms and conditions of the proposed plea agreement with his attorney and requested that the circuit court accept the agreement. Additionally, Bethea acknowledged that he had "fully underst[oo]d" the charges he had pled guilty to and had discussed "the elements the Commonwealth would have to prove" and "any defenses" to those charges with his attorney. Bethea also waived his rights to trial by jury and to present a defense to the charges against him. Following this portion of the colloquy, Bethea confirmed that he still wanted the circuit court to accept his guilty pleas.

The circuit court then continued the colloquy by reciting the applicable sentencing range for each of the offenses to which Bethea had pled guilty. Bethea acknowledged he understood he could be sentenced to the maximum punishments reflected in the sentencing ranges for each charge to which he had pled guilty. Bethea also confirmed that he understood that his convictions could have adverse immigration consequences. At the conclusion of the colloquy, the circuit court accepted Bethea's guilty pleas as "knowingly and intelligently" made "with a full understanding of the consequences thereof."

During Bethea's subsequent sentencing hearing, the Commonwealth introduced written "victim impact statements" from both Wright and Williams. Wright testified in addition to his statement that during Bethea's attack, he sustained a laceration to his head that required "nine staples" and that he continues to experience dizziness from this head injury. He also noted that he suffered financial loss from Bethea stealing his car and cell phone. Also, Williams testified for the Commonwealth, providing that as a result of her grandfather's injuries, he was "not there

- 7 -

anymore mentally." She also lamented that due to Bethea's actions, she no longer "trust[s] men" and had lost the ability to "function." She further stated that she continued to have "nightmares" from the incident.

The circuit court which had previously ordered the preparation of a presentence investigation report received the report in evidence. The report which had been prepared by the probation officer with the assistance of Bethea included, in part, Bethea's criminal history which reflected no prior adult convictions along with other data including responses by Bethea to questions relevant to sentencing posed by the probation officer.

In mitigation of his sentence, Bethea called his father, Cecil Lindse ("Lindse"), and his aunt, Tracy Jones ("Jones"), to testify on his behalf concerning his history of mental illness. Lindse explained that Bethea required "special education" services in school as a child because he was "disabled" and that he later developed schizophrenia, bipolar depression, and anxiety disorders as an adult. Jones testified that before his arrest, Bethea was not receiving medications to treat his mental illness, but he had begun receiving psychiatric treatment while incarcerated. Counsel for Bethea then argued that his mental health diagnoses and other mitigating evidence— including his acceptance of responsibility by pleading guilty, limited criminal history, and the substantial period of jail time already served pending trial—justified leniency. In allocution, Bethea asserted that his commission of the offenses was the result of his inability to cope with the stress of his "toxic relationship" with Williams.

The circuit court noted that although Bethea had pled guilty, he did not express remorse or apologize for his crimes. Rather, Bethea cited his "toxic relationship" with Williams as the reason for committing the crimes which demonstrated "a complete lack of understanding of the consequences" of his conduct. The circuit court then imposed a total sentence of 90 years'

- 8 -

incarceration, 10 of which were mandatory, with 63 years of the balance remaining suspended. Bethea appealed.

## II. ANALYSIS

### A. *Standard of Review*

"Where a conviction is rendered upon . . . a [guilty] plea and the punishment fixed by law is in fact imposed in a proceeding free of jurisdictional defect, there is nothing to appeal." *Savino v. Commonwealth*, 239 Va. 534, 539 (1990) (quoting *Peyton v. King*, 210 Va. 194, 196-97 (1969)). Thus, we review the plea agreement to determine its validity under the federal and Virginian constitutional requirements, which are questions of law subject to de novo review on appeal. *Riddick v. Commonwealth*, 72 Va. App. 132, 139 (2020). Also, "as a question of law, the interpretation of one of the Rules of [the Supreme] Court is subject to de novo review." *N. Va. Real Est., Inc. v. Martins*, 283 Va. 86, 102-03 (2012).

We review a circuit court's sentencing decisions for abuse of discretion. *See Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

### B. *Bethea's voluntariness arguments are procedurally defaulted under Rule 5A:18.*

First, Bethea assigns error to the circuit court's acceptance of his guilty pleas because he claims he did not enter them freely and voluntarily. Bethea further asserts that the "record failed to establish that [he] was given [adequate] notice of the elements" of the charged offenses because the circuit court did not recite each element during the plea colloquy.[4] Relying on

---

[4] In citing to *Henderson v. Morgan*, 426 U.S. 637 (1976), Bethea contends on brief that "[i]n order to establish that a plea is knowingly entered into, the defendant must be given notice of the essential elements of the crime and of the range of possible penalties." From this language, it appears Bethea also argues that the circuit court failed to advise him of the correct

*Padilla v. Kentucky*, 559 U.S. 356 (2010), Bethea also contends that he was uninformed of various "collateral consequences" of his guilty pleas, including the fact that his convictions would disqualify him from accessing certain public benefits, prevent him from obtaining "business and occupational licenses," and make him subject to "recidivist statutes." Finally, he asserts that the circuit court "failed to establish for the record that [he] possessed the requisite mental competency to knowingly enter his pleas."

Bethea acknowledges that he did not move to withdraw his guilty pleas or otherwise preserve his arguments for appellate review but asks that we address his untimely arguments based on the good cause and ends of justice exceptions of Rule 5A:18. We decline to do so.

1. The "good cause" exception to Rule 5A:18 does not apply because Bethea failed to object that his pleas were involuntarily entered despite ample opportunity to do so.

"'Good cause' relates to the reason why an objection was not stated at the time of the ruling." *Pope v. Commonwealth*, 60 Va. App. 486, 508 (2012) (quoting *Campbell v. Commonwealth*, 14 Va. App. 988, 996 (1992) (en banc)). "The Court may only invoke the 'good cause' exception where an appellant did not have the opportunity to object to a ruling in the [circuit] court; however, when an appellant 'had the opportunity to object but elected not to do so,' the exception does not apply." *Perry v. Commonwealth*, 58 Va. App. 655, 667 (2011) (quoting *Luck v. Commonwealth*, 32 Va. App. 827, 834 (2000)).

Here, the circuit court accepted Bethea's guilty pleas on December 6, 2022, and it entered final judgment on June 6, 2023. "[T]o correct manifest injustice, the court within twenty-one days after entry of a final order may set aside the judgment of conviction and permit the

---

"range of possible penalties" for each charged offense. But, as he fails to develop this potential argument beyond this isolated statement, we find it abandoned. *Lafferty v. Sch. Bd. of Fairfax Cnty.*, 293 Va. 354, 365 (2017) ("Absent argument and authority, an assignment of error is deemed to be abandoned.").

defendant to withdraw his plea." Code § 19.2-296. Bethea had over six months to move to withdraw his pleas. But he did not do so. Nothing in the record suggests that anything prevented Bethea from filing such a motion. Thus, the good cause exception does not apply because Bethea failed to alert the circuit court that his pleas were involuntarily entered despite having ample opportunity to do so. *See Perry*, 58 Va. App. at 667.

2. The "ends of justice" exception to Rule 5A:18 does not apply to Bethea's assignment because the circuit court did not err.

"The 'ends of justice' exception to Rule 5A:18 is 'narrow and is to be used sparingly.'" *Melick v. Commonwealth*, 69 Va. App. 122, 146 (2018) (quoting *Pearce v. Commonwealth*, 53 Va. App. 113, 123 (2008)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)). "To prevent the exception from swallowing the rule, Virginia courts applying the ends-of-justice exception require a defendant to present not only a winning argument on appeal but also one demonstrating that the [circuit] court's error results in a 'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546-47 (2013) (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009)). "In order to avail [them]self of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." *Melick*, 69 Va. App. at 146 (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997)).

To be constitutionally valid, a guilty plea "must be 'knowingly, voluntarily, and intelligently' given" and, on appeal, "'the record must contain an "affirmative showing" that the guilty plea was entered voluntarily and intelligently.'" *Holman v. Commonwealth*, 77 Va. App. 283, 302 (2023) (quoting *Hill v. Commonwealth*, 47 Va. App. 667, 671, 674 (2006)). Moreover,

- 11 -

"Rule 3A:8(b) embodies the due process requirements for accepting a plea of guilty or *nolo contendere*." *Allen v. Commonwealth*, 27 Va. App. 726, 732 (1998). That provision requires that before accepting a defendant's plea, "the [circuit] court must determine if the defendant is aware of his constitutional rights, the nature of the charges against him, and whether the plea is intelligently and voluntarily made, all of which must appear on the record." *Zigta v. Commonwealth*, 38 Va. App. 149, 157 (2002); *see also Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (holding that a defendant must receive "real notice of the true *nature* of the charge against him" for a plea to be voluntary (emphasis added) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941))).

Here, Bethea raises three grounds that he contends establish that the circuit court erred in accepting his plea agreement: 1) that he was not given the proper notice required by *Henderson*, 426 U.S. 637; 2) that he was not informed of all the direct consequences of pleading guilty, as required by *Padilla*, 559 U.S. 356; and 3) that his pleas were not voluntary because the circuit court "failed to establish" that he "possessed the requisite mental competency to knowingly enter his pleas" on the record. We take each in turn.

> a. Because Bethea discussed the elements of his offenses with his attorney before entering his pleas, *Henderson* is inapplicable.

First, Bethea asserts that the circuit court committed error in approving his pleas, which would permit the exception's application, as he asserts that "the record failed to establish" that he "was given notice of the elements" of the charged offenses as required by *Henderson*. In light of the clear evidence in the record, we disagree.

Indeed, during his plea colloquy, Bethea acknowledged he had discussed the charges with his attorney and was aware of the elements of each offense and possible defenses. In addition, Bethea's contention that due process required the circuit court to specify each element of the charged offenses before accepting his guilty pleas is unpersuasive. As noted, the Rules of the

- 12 -

Supreme Court of Virginia only require the circuit court to confirm that the defendant "understand[s] . . . the *nature of the charge* and the consequences of the plea." Rule 3A:8(b)(1) (emphasis added).

Moreover, Bethea's reliance on *Henderson* is misplaced. Although, under *Henderson*, a defendant cannot voluntarily enter a guilty plea "without having been informed of the crime's elements," it is not always necessary for "the judge . . . himself [to] explain the elements of each charge to the defendant on the record." *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005). "Rather, the constitutional prerequisites of a valid plea may be satisfied where the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his own, competent counsel." *Id.* Thus, in *Henderson*, the defendant's guilty plea to second-degree murder was involuntary because during the plea colloquy "[t]here was no discussion of the elements of the offense of second-degree murder, *no indication that the nature of the offense had ever been discussed with respondent*, and no reference of any kind to the requirement of intent to cause the death of the victim." *Henderson*, 426 U.S. at 642-43 (emphasis added). In contrast, Bethea in this case confirmed that he had discussed the elements of the charged offenses with his attorney before deciding to plead guilty.

> b. The circuit court informed Bethea of all the direct consequences of his guilty pleas.

Bethea next argues that, under *Padilla*, the circuit court's failure to inform him of various consequences of his convictions rendered his guilty pleas invalid. As they were merely collateral, we find this argument to be unpersuasive.

It is well established that "[f]or a guilty plea to be constitutionally valid, a defendant must be made aware of all the direct, *but not the collateral*, consequences of his plea." *Brown v. Commonwealth*, 297 Va. 295, 302 (2019) (emphasis added) (quoting *Meyer v. Branker*, 506 F.3d 358, 367-68 (4th Cir. 2007)); *see Zigta*, 38 Va. App. at 157 ("Neither Rule 3A:8(b) nor any statute

- 13 -

or case law in Virginia requires a [circuit] court to inform a defendant of any collateral consequences that may arise upon the entry of a guilty plea."). Thus, the circuit court had no duty to advise Bethea that his convictions might result in the collateral consequences he cites on appeal.

*Padilla* is likewise inapposite. That case did not address the voluntariness of the defendant's guilty plea. *Padilla*, 559 U.S. at 374-75. Rather, the appellant in *Padilla* raised only a Sixth Amendment ineffective assistance of counsel claim, and primarily concerned the consequence that the defendant would face deportation as a result of his plea. *Id.* As Bethea does not assert that he faces deportation as a result of his guilty pleas, *Padilla* does not apply to his case.

> c. As Bethea did not raise an issue related to his mental competency at the time he entered his plea agreement, the circuit court was not required to make that determination.

Finally, Bethea argues that his pleas were not voluntary because the circuit court "failed to establish for the record that [he] possessed the requisite mental competency to knowingly enter his pleas . . . or otherwise exclude the possibility that [he] was suffering from diminished capacity." Bethea does not claim that he was, in fact, incompetent when he entered his guilty pleas. Rather, he asserts that the circuit court erred by failing to conduct a competency hearing sua sponte to ensure he had the capacity to enter his guilty pleas voluntarily. We disagree.

"Core due process principles forbid" states from convicting mentally incompetent defendants, either following a trial or on a guilty plea. *Smith v. Commonwealth*, 48 Va. App. 521, 532 (2006); *see also Pate v. Robinson*, 383 U.S. 375, 378 (1966). To prevail on a claim that a trial judge should have conducted a competency hearing sua sponte, an appellant "must establish that the . . . [circuit] court ignored facts raising a 'bona fide doubt' regarding [his] competency to stand trial." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000); *Pate*, 383 U.S. at 385; *Godinez v. Moran*, 509 U.S. 389, 401 n.13 (1993) (noting that a circuit court need not conduct a competency hearing during a guilty plea colloquy unless there is "reason to doubt the defendant's competence").

The test for competency to plead guilty or stand trial "is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez*, 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *see also* Code § 19.2-169.1(A) (specifying criteria for incompetency). "Although there are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed,' 'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant.'" *Burket*, 208 F.3d at 192 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Other factors probative of a defendant's competency include his trial counsel's opinion on the subject, *Clark v. Commonwealth*, 73 Va. App. 695, 708 (2021), and his counsel's decision not to raise competency as an issue, *Burket*, 208 F.3d at 192. We give significant weight to the last two factors because defense counsel often is "in the best position to speak to [his] client's ability to understand proceedings and assist counsel at trial." *Clark*, 73 Va. App. at 708.

Here, Bethea failed to demonstrate that his mental capacity was in question at the time he entered the plea agreement. Indeed, neither Bethea nor his trial counsel raised the issue of competency at the plea hearing. *See Burket*, 208 F.3d at 192. Although before pleading guilty, Bethea requested a continuance to undergo a second forensic evaluation of his sanity during the offenses and obtain witnesses to corroborate an insanity defense, Bethea's state of mind at that time was irrelevant to the question of whether he was competent to plead. *See Godinez*, 509 U.S. at 396.

Furthermore, nothing in the record suggests that Bethea was incompetent when he entered his guilty pleas. To begin, a forensic evaluator previously had examined Bethea and opined that he was competent to stand trial. Although Bethea suffered from several mental illnesses, the evaluator concluded that he "possesse[d] a capacity for rational and factual understanding of court and the ability to assist counsel in his own defense." Consistent with those findings, Bethea confirmed

during the plea colloquy that he did not have "any mental conditions" that would interfere with his ability to assist his counsel or understand the proceedings. Bethea also verified that he was not under the influence of drugs or alcohol; could "read, write[,] and understand the English Language"; and had signed the written plea agreement accepted by the court after discussing its terms with his attorney.

Also, the proffers the circuit court received from Bethea's counsel just before conducting the plea colloquy suggested Bethea's counsel thought he was competent. *See Clark*, 73 Va. App. at 708. Indeed, Bethea's attorney proffered that he recently had received a plea offer from the Commonwealth and needed more time to review it with Bethea and discuss his trial rights, thus implying he believed that Bethea could plea bargain intelligently and voluntarily waive his trial rights. Also, to note, Bethea's counsel never raised the issue of competency again after the initial evaluation was completed. He even explicitly represented in a prior proceeding, "I'm not concerned about [Bethea's] competency to stand trial." Thus, Bethea has failed to demonstrate that the circuit "court ignored facts raising a 'bona fide doubt' regarding [his] competency to stand trial." *Burket*, 208 F.3d at 192. Therefore, we cannot conclude that the circuit court erred by failing to conduct a competency hearing sua sponte before accepting his guilty pleas.

In sum, each of Bethea's arguments fail to establish that the circuit court erred as alleged. Thus, the ends of justice exception does not apply and his assignment is waived.

C. *The circuit court properly weighed Bethea's mitigating evidence in fashioning his sentence.*

Next, Bethea contends that the circuit court erred by imposing a 27-year active sentence against him without properly weighing his mitigating evidence, including his acceptance of responsibility by pleading guilty, his limited criminal record, and the substantial period of time he spent in jail awaiting trial. His argument implies that because the circuit court did not

specifically mention those factors in fashioning his sentence, it must have "ignored" them. We disagree.

"[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Laney v. Commonwealth*, 76 Va. App. 155, 166 (2022) (alteration in original) (quoting *Minh Duy Du*, 292 Va. at 564). It is within the circuit court's purview to weigh the mitigating circumstances of the case in deciding a sentence, including those circumstances Bethea cites on appeal. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). Balanced against the circumstances that may have favored Bethea, however, were the seriousness of his offenses, the enduring harm his attack caused the victims, and his lack of remorse. And "[b]arring clear evidence to the contrary, this Court will not presume that a [circuit] court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992).

Here, Bethea's argument fails to identify such clear evidence, instead merely suggesting that the circuit court must have ignored his mitigating evidence because it did not expressly reference it in making its sentencing determination. The circuit court was not required to explain the specific weight it assigned to each piece of evidence. Indeed, "[a]bsent a statutory requirement to do so, 'a [circuit] court is not required to give findings of fact and conclusions of law.'" *Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015) (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 627 (1982)).

Moreover, "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). Here, the sentence the circuit court imposed was within the ranges set by the legislature. *See* Code §§ 18.2-10, -47, -51, -53.1, -58, -95,

-308.2.  Thus, we conclude that the circuit court appropriately weighed Bethea's mitigating evidence before imposing a sentence within the limitations set by the legislature.

## III. CONCLUSION

For the foregoing reasons, we find no error.  Thus, the judgment of the circuit court is affirmed.

*Affirmed*.